## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**PAMELA H.,**

      **Plaintiff,**

**v.**                                                    **Case No.: 2:23-cv-00376**

**MARTIN J. O'MALLEY,**
**Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### <u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 4, 5).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be

**AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On June 5, 2020, Plaintiff Pamela H. ("Claimant") protectively filed an application for disabled widow's benefits, alleging a disability onset date of July 3, 2019 due to "upper back injury, chronic pain, arthritis in neck, pinched nerve in lower left side of back, bursitis in left hip, mass in bottom of back, diabetes, and muscle spasms in back." (Tr. at 13, 232). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on August 30, 2022 before the Honorable M. Drew Crislip, Administrative Law Judge (the "ALJ"). (Tr. at 34-51). By written decision dated September 13, 2022, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 10-33). The ALJ's decision became the final decision of the Commissioner on March 10, 2023 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed a Transcript of the Administrative Proceedings. (ECF No. 3). Claimant filed a Brief seeking judgment on the pleadings, (ECF No. 4), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 5), to which Claimant filed a reply, (ECF No. 6). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 58 years old on her alleged disability onset date and 61 years old on the date of the ALJ's decision. (Tr. at 87). She completed high school, communicates in English, and previously worked in a composite position as a teaching aide and deaf interpreter. (Tr. at 46, 231, 233).

III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"), found at 20 C.F.R § Pt. 404, Subpt. P, App. 1. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

3

of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is

deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a mental disorder described in the Listing. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant was an unmarried widow of the named deceased insured worker and has attained the age of 50; thus, she met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act. (Tr. at 15, Finding No. 1). The ALJ further determined that the prescribed period ended on May 31, 2021. (*Id.*, Finding No. 2).[1] At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 3, 2019, the alleged disability onset date. (*Id.*, Finding No. 3). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: cervical and lumbar degenerative disc disease (DDD) and osteoarthritis of the knee. (Tr. at 15, Finding No. 4). The ALJ also considered Claimant's

---

[1] The ALJ explained that the prescribed period ends the month before the claimant turns 60 or, if earlier, seven years after the worker's death or seven years after the widow was last entitled to survivor's benefits, whichever is later. (Tr. at 13).

diagnoses of diabetes mellitus, type II; carpal tunnel syndrome; hypertension; hyperlipidemia; gastroesophageal reflux disease (GERD); obesity; lumbar schwannoma (benign nerve sheath tumor); somatic symptom disorder; and unspecified depressive disorder, but the ALJ found that the impairments were non-severe. (Tr. at 16-18). The ALJ concluded that Claimant's coronary artery disease was not a medically determinable impairment. (Tr. at 18-19).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19, Finding No. 5). Thus, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform lifting, carrying, pushing, and pulling of 20 pounds occasionally and 10 pounds frequently; sitting of six hours in an eight-hour workday; and standing and/or walking of six hours in an eight-hour workday. She can frequently operate foot controls and hand controls. She can perform occasional overhead reaching and frequent reaching in all other directions. She can perform frequent handling, fingering, and feeling. She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can occasionally balance (navigate uneven or slippery terrain) and stoop, but never kneel, crouch, or crawl. She can never work at unprotected heights, but can work around moving mechanical parts of dangerous machinery or operate a motorized vehicle occasionally. Also occasionally, she can work in weather, in humidity and wetness, or in pulmonary irritants, but never in extreme cold, never in extreme heat, and never in vibration. In addition to normal breaks, she would be off task 5 percent of time in an 8-hour workday.

(Tr. at 19-26, Finding No. 6).

At the fourth step, the ALJ concluded that Claimant could perform her past relevant work as a teacher's aide/deaf interpreter. (Tr. at 26-27, Finding No. 7). Consequently, the ALJ decided that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 8).

IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ erred in (1) concluding at step two that her mental impairments were non-severe and (2) not assessing mental RFC restrictions for her mild mental limitations or explaining why mental RFC restrictions were omitted. (ECF Nos. 4 at 3-21, 6 at 1-8). In response, the Commissioner argues that substantial evidence supports the ALJ's step two and RFC findings regarding Claimant's mental impairments, and the ALJ reasonably found that Claimant's non-severe mental impairments did not impact her ability to perform her past relevant skilled work. (ECF No. 5 at 9-20).

V.    **Relevant Evidence**

The undersigned thoroughly examined the entire record. The evidence that is most pertinent to Claimant's challenges is summarized below.

### A. Treatment Records

On July 18, 2018, Claimant presented to her primary care physician, Crystal Bastin, M.D. (Tr. at 324). It was noted in Claimant's medical history that she was diagnosed with depression that began in April 2015. (Tr. at 325). During this visit, Claimant's PHQ-2 score was zero,[2] her mood was normal, and she displayed appropriate affect. (Tr. at 327). Dr. Bastin renewed Claimant's prescription for Cymbalta, which was significantly reducing the pain from her physical conditions. (Tr. at 328).

During a subsequent pain management visit on July 26, 2018, Claimant denied anxiety and depression. (Tr. at 520). She was cooperative with appropriate mood and affect. (*Id.*). She likewise denied feeling down, depressed, or hopeless during her pain

---

[2] The PHQ-2 is a depression screening tool in which the patient rates on a scale of zero to six the degree to which he or she experienced depressed mood and anhedonia over the past two weeks. https://cde.nida.nih.gov/instrument/fc216f70-be8e-ac44-e040-bb89ad433387.

management appointment on August 28, 2018. (Tr. at 530). Claimant again denied anxiety and depression and was cooperative with appropriate mood and affect on December 11, 2018. (Tr. at 411).

On January 9, 2019, Rainie Niceswanger, FNP-BC, recorded Claimant's intact insight, logical thought content, normal mood, and appropriate affect. (Tr. at 423). Claimant once more denied anxiety and depression and was cooperative with appropriate mood and affect during her January 11, 2019 pain management appointment. (Tr. at 555). On January 21, 2019, Claimant told Dr. Bastin that she wanted to stop Cymbalta and go back to Zoloft because Cymbalta was not helping her pain or depression. (Tr. at 331). She displayed normal mood and appropriate affect with a PHQ-2 score of two. (Tr. at 334). Dr. Bastin prescribed Claimant Zoloft. (Tr. at 335). During follow up with Dr. Bastin on March 6, 2019, Claimant's PHQ-2 score had returned to zero and she displayed normal mood and appropriate affect. (Tr. at 340).

On March 15, 2019, Claimant presented for a neurology appointment at which she demonstrated intact insight, logical thought content, normal mood, and appropriate affect. (Tr. at 431). On April 30, 2019, Claimant had primary care, pain management, and endocrinology appointments. All three providers noted Claimant's normal mood and appropriate affect. (Tr. at 345, 574, 750). She denied anxiety and depression, was cooperative, and had a PHQ-2 of zero. (Tr. at 574, 750). Claimant's providers reiterated the same normal findings on April 30, May 13, May 31, July 30, August 19, September 11 and 19, and November 6 and 27, 2019 and March 4 and 11, June 4 and 11, September 15, and October 7, 2020. Specifically, her PHQ-2 score remained zero, and she demonstrated intact insight, logical thought content, normal mood, and appropriate affect. (Tr. at 353, 359, 442, 457, 466, 475, 483, 580, 588, 596, 607, 728, 734, 738, 742, 750, 754, 767, 774).

On October 13, 2020, Claimant was cooperative during her pain management appointment, exhibited appropriate mood and affect, had a PHQ-2 score of zero, and was "not at all" feeling down, depressed, or hopeless or having little interest or pleasure doing things. (Tr. at 672). During an October 21, 2020 cardiology appointment, Claimant appeared to be pleasant and reported that she was very active in terms of caring for her mom. (Tr. at 502-03). On January 13, 2021, Claimant was grossly oriented with normal mood, appropriate affect, and a PHQ-2 score of zero (Tr. at 778). She denied anxiety and depression during a neurosurgery appointment on April 7, 2021, and her rate of thoughts, abstract reasoning, and mood were normal; thought content logical; computation intact for basic mathematical constructs; and her affect appropriate. (Tr. at 487). On April 15, 2021, Claimant was cooperative during her pain management appointment, demonstrated appropriate mood and affect, had a PHQ-2 score of zero, and was "not at all" feeling down, depressed, or hopeless or having little interest or pleasure doing things. (Tr. at 716-17).

Claimant followed up with Dr. Bastin on June 21, 2021. She was still taking Zoloft and she showed normal affect and thought processes. (Tr. at 491-92). Her PHQ-2 score was two. (Tr. at 493). During a pain management appointment on July 15, 2021, Claimant demonstrated appropriate mood and affect, had a PHQ-2 score of zero, and was "not at all" feeling down, depressed, or hopeless or having little interest or pleasure doing things. (Tr. at 697). On the same date, she reported depression to her endocrinologist. (Tr. at 781). Claimant again reported depression to her endocrinologist on October 14, 2021, but she was cooperative and presented with normal affect and good insight and judgment. (Tr. at 792). She continued to take Zoloft. (Tr. at 793). On October 14, 2021, Claimant again exhibited appropriate mood and affect during her pain management visit, had a

PHQ-2 score of zero, and was "not at all" feeling down, depressed, or hopeless or having little interest or pleasure doing things. (Tr. at 927)

### B. Evaluations, Opinions, and Prior Administrative Findings

On December 14, 2020, psychologist Nicole M. Smith, M.A., performed an Adult Mental Status Examination of Claimant. Claimant expressed that she applied for benefits because her "upper back got really bad in 2009" when she was lifting her father and carrying oxygen tanks. (Tr. at 389). The pain made her irritable and frustrated. (*Id.*). She could not stand for long and needed to sit or lie down at will. (*Id.*). According to Claimant, she started feeling pain after 30 minutes to one hour, and she received relief from medications, but she could not drive while taking them. (*Id.*). She stated that chronic pain, functional limitations related to chronic pain, health problems, and depression were the primary reasons she is unable to maintain employment. (Tr. at 390). Claimant appeared frustrated with her inability to work and perform the same activities, and she reported sadness, worry, and anxiety. (*Id.*). Her primary care physician, Dr. Bastin, prescribed medication for depression. (*Id.*). Claimant reported that she graduated from high school with average grades, was not in special education classes, and was never retained. (Tr. at 391).

Claimant's daily activities included taking her medication, caring for pets, keeping scheduled medical appointments with reminders, getting dressed, watching television and playing games on her phone, and performing self-care duties independently. (Tr. at 393). She went to the store and ran errands every week alone and talked on the phone when necessary, but she seldom visited with family and friends. (*Id.*). Claimant regularly attended church or other social functions, maintained a checking account, paid bills, and managed her own finances. (*Id.*). She had a medical card and received her husband's

Black Lung benefits and pension. (*Id.*).

During the consultative examination, Claimant exhibited a slightly depressed mood, mildly impaired social functioning, moderately impaired judgment, and she was constantly fidgeting with the back of her neck and upper back due to pain. (Tr. at 391-92). Nevertheless, Claimant was cooperative and oriented in all spheres; maintained good eye contact; displayed broad affect, understandable and connected thought processes, good insight, and normal, immediate and remote memory, concentration, persistence, and pace. (Tr. at 391-92). Ms. Smith diagnosed Claimant with somatic symptom disorder with predominant pain and unspecified depressive disorder. (Tr. at 392).

On January 28, 2021, James Capage, Ph.D., performed a psychiatric review technique based upon his review of Claimant's records. He assessed that Claimant had mild limitations in maintaining concentration, persistence, or pace, but no limitations in the other paragraph B criteria. (Tr. at 100). John Todd, Ph.D., affirmed these findings on November 10, 2021. (Tr. at 116-17). During Claimant's administrative hearing on August 30, 2022, psychologist Evelyn Adamo, Ph.D., testified that Claimant had normal mental status examination findings during her consultative examination in 2020 with no depressed mood, her conditions were "maintained on Zoloft" prescribed by her primary care doctor, and she denied depressive symptoms during her most recent pain management appointment in July 2022. (Tr. at 40). Dr. Adamo stated that Claimant did not have a severe mental impairment. (*Id.*).

### C. Claimant's Statements

On August 14, 2020, Claimant completed an Adult Function Report. She did not list any mental illnesses, injuries, or conditions that restricted her ability to work. (Tr. at 252). She reportedly lived alone in a mobile home and did not care for any pets or people.

(Tr. at 253). Claimant did not require reminders to take care of her personal needs, take her medication, or go places. (Tr. at 254, 256). She prepared her own meals; watched television, read, and used her iPad or computer every day; talked on the phone or texted two to three times per week; put dishes in the dishwasher, did laundry, and swept every three to four days; drove a car; could go out alone, pay bills, count change, handle a savings account, and use a checkbook or money orders without any change since her illnesses, injuries, or conditions began; went grocery shopping twice every week; and she did not have any problems getting along with others. (Tr. at 254-56). Her conditions did not affect her ability to talk, hear, remember, complete tasks, understand, follow instructions, or get along with others, but she had trouble with concentration and was distracted easily. (Tr. at 257). She followed written and spoken instructions "ok" and got along "good" with authority figures. (*Id.*). Claimant had never been fired because of problems getting along with others, but she became irritable due to stress and did not handle changes in routine well because she "like[d] routine." (Tr. at 257-58).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

Claimant challenges the ALJ's step two and RFC analyses of her mental impairments, which are addressed, in turn, as follows.

### A. *Step Two*

Claimant contends that the ALJ erred in finding that her mental impairments were non-severe at step two of the sequential evaluation. At the second step of the sequential evaluation, the ALJ determines whether a claimant has medically determinable impairments, and, if so, whether such impairments are severe within the meaning of the regulation. 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment "must be established by objective medical evidence from an acceptable medical source," and the SSA "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." *Id*. at § 404.1521. As section DI 24501.020 of the SSA's Program Operations Manual System (POMS) explains, "[o]bjective medical evidence means signs, laboratory findings, or both." The term "signs" is defined as "one or more anatomical, physiological, or psychological abnormalities that are observable, apart from the claimant's statements (description of symptoms)," and the "[s]igns must

13

be shown by medically acceptable clinical diagnostic techniques." POMS DI 24501.020. "Laboratory findings" are defined as "one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id*. Finally, "[d]iagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id*.

A medically determinable impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1522(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b). The impairment must also meet the 12-month duration requirement, meaning that, unless the impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1509. Courts often find that an error at step two is harmless when the ALJ found at least one severe impairment, proceeded with the sequential evaluation, and considered the effect of the challenged impairment(s) at subsequent steps of the analysis. *Cook v. Colvin*, No. 2:15-CV-07181, 2016 WL 5661348, at *9 (S.D.W. Va. Sept. 29, 2016) (collecting cases).

14

In this case, the ALJ concluded at step two that Claimant's medically determinable impairments of depressive disorder and somatic symptom disorder considered singly and in combination did not cause more than minimal limitation in her ability to perform basic mental work activities. (Tr. at 17). In making that finding, the ALJ applied the special technique to rate the degree of functional impairment in each of the paragraph B categories. (*Id.*). On a five-point scale, ranging from no, mild, moderate, marked, and extreme limitations, the ALJ found that Claimant had mild functional limitations in each paragraph B category. (*Id.*). A "mild limitation" means that the claimant's ability to function in the category is "slightly limited," whereas a finding of "no limitation" reflects that the claimant is able to function in that category area "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(a), (b).

The ALJ noted that, in the area of understanding, remembering, or applying information, Claimant reported not needing reminders to care for herself or take medications, and she watched television, read, and used an iPad or computer daily; was "ok" at following instructions; graduated from high school with average grades, and she was not in special education classes or retained; and, during her consultative examination, her immediate and remote memory were normal and recent memory was only mildly impaired. (*Id.*). In the category of interacting with others, Claimant drove, went out alone, shopped in stores, spent time with others, and reported no problems getting along with others. (*Id.*). During her consultative examination, Claimant was cooperative, maintained good eye contact, and showed a broad affect, although she demonstrated depressed mood and was constantly fidgeting; she seldom visited with people and did not have close friends, but she ran errands weekly, talked on the telephone,

15

attended church and other social functions, and regularly went outside. (Tr. at 17-18).

In terms of concentrating, persisting, or maintaining pace, Claimant reported difficulty concentrating and completing tasks, but she could watch television, use an iPad and computer, read, talk on the phone, drive, and manage money. (Tr. at 18). Claimant's concentration, persistence, and pace were normal during her consultative examination, and she maintained a checking account, paid bills, watched television, and played games on her phone. (*Id*.). Finally, in the area of adapting or managing herself, Claimant reported that stress made her irritable and she did not handle changes in routine well. (*Id*.). However, she could take care of herself, albeit at a slower pace due to pain; perform household chores; drive; shop; manage money; watch television; talk or text on the phone; use an iPad or computer; take her medication; care for pets; perform self-care duties independently; complete some household chores; regularly go outside; play games on her phone; manage her finances; regularly attend church; obtain a medical card; and talk on the phone when necessary. (*Id*.).

Claimant contends that the ALJ violated the *de minimis* standard at step two of the sequential evaluation in finding that her mental impairments were non-severe. (ECF No. 4 at 17-18) (citing SSR 85-28, 1985 WL 56856) (stating that a claimant need only demonstrate something beyond a slight abnormality or combination of abnormalities that have more than a minimal effect on the ability to work). She also argues that the ALJ did not demonstrate that he properly considered the cumulative impact of her non-severe mental impairments, subjective symptoms, or the unique nature of her somatoform disorder. (*Id*. at 18-21). None of these arguments are persuasive. The ALJ explicitly considered whether Claimant's mental impairments, alone or in combination, caused more than a minimal limitation in her ability to perform basic mental work activities. (Tr.

at 17). Therefore, he explicitly applied the correct legal standard. In addition, the ALJ noted Claimant's subjective symptoms such as needing reminders to take care of her personal needs and medication, difficulty concentrating and finishing what she started, irritability caused by stress, and problems handling changes in routine. (Tr. at 17-18). The ALJ compared that evidence to Claimant's statements regarding the nature and extent of activities that she could perform, objective findings during her consultative examination, and her statements in function reports. (*Id.*). Claimant does not identify any critical conflicting evidence that the ALJ overlooked or fatal flaws in his reasoning.

Moreover, the ALJ's conclusion that Claimant's mental impairments are non-severe is supported by the record. Claimant was diagnosed with depression for which she took Cymbalta before returning to Zoloft because she preferred it. (Tr. at 325, 331). Before, during, and after the relevant period, Claimant consistently appeared for her scheduled appointments, interacted well with her medical providers, exhibited almost universally normal mental status examination findings, and generally had a PHQ-2 score of zero and denied mental symptoms. (Tr. at 327, 334, 335, 340, 345, 353, 359-60, 391-92, 411, 423, 431, 442, 457, 466, 475, 483, 487, 491, 502-03, 520, 530, 555, 574, 580, 588, 596, 607, 672, 697, 716-17, 728, 734, 738, 742, 750, 754, 767, 774, 778, 792, 927). As the ALJ noted, Claimant also reported a variety of activities, including going out alone, running errands, watching television and playing games, handling her finances, caring for herself independently, and going to church. There is certainly more than a scintilla of evidence to support the ALJ's conclusion that Claimant's mental impairments did not cause more than a minimal limitation in her ability to perform basic mental work activities.

To any extent that the ALJ did not elaborate further regarding his analysis of the

cumulative impact of Claimant's non-severe mental impairments, subjective symptoms, or somatoform disorder at step two, such error is harmless because the ALJ proceeded with the sequential evaluation and analyzed Claimant's mental impairments at subsequent steps of the evaluation. For all of those reasons, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's mental impairments is supported by substantial evidence and, to the extent that the analysis could have been more robust, that deficiency did not prejudice Claimant because the impairments were considered in later steps of the disability process.

### B. RFC

Claimant also challenges the Commissioner's decision on the basis that the ALJ failed to include mental RFC limitations or explain why none were assessed. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the *most* that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*.

According to SSR 96-8p, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3. The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding,

remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ explained that he was persuaded, in part, by Dr. Adamo's

testimony concerning Claimant's mental impairments, but he was not persuaded by the state agency psychologists' prior administrative findings. (Tr. at 24). The ALJ noted that Dr. Adamo testified that Claimant was diagnosed with depressive disorder and somatic disorder, but her conditions were maintained on Zoloft. (*Id.*). The ALJ considered that the longitudinal record showed Claimant's mental functioning to be within normal limits or no more than slightly impaired, but, due to the typical symptomology of her conditions, Claimant would be expected to experience interruption in fully effective functionality in the paragraph B criteria, at least from time-to-time. (*Id.*).

The ALJ plainly provided a logical bridge from the evidence to his conclusion that no mental RFC restrictions were warranted. The ALJ thoroughly explained his reasoning that Claimant's mental impairments did not cause more than minimal limitation in her ability to perform basic work activities. While the step two severity finding is not a substitute for the RFC analysis, it provided the necessary insight, along with the ALJ's evaluation of the prior administrative findings and other evidence, to allow for meaningful review. *See, e.g., Kimberly B. C. v. Kijakazi*, No. 1:22CV617, 2023 WL 4974033, at *7-8 (M.D.N.C. Aug. 3, 2023). The ALJ was persuaded by Dr. Adamo's testimony, which the ALJ summarized as finding "no work-related dysfunction" despite the mild mental limitations. (Tr. at 40).

Further, it should be noted that the ALJ's RFC discussion of Claimant's mental impairments, although it is not expansive, reflects the minimal mental health information in the record. Claimant primarily alleged physical symptoms and limitations during the relevant period. Her primary care provider prescribed her an antidepressant, which was reportedly effective in managing her symptoms. As noted, Claimant's mental status examination findings were overwhelmingly normal, she appeared for her frequent

medical appointments where she interacted normally with providers, and she largely denied any mental symptoms. (Tr. at 327, 334, 335, 340, 345, 353, 359-60, 391-92, 411, 423, 431, 442, 457, 466, 475, 483, 487, 491, 502-03, 520, 530, 555, 574, 580, 588, 596, 607, 672, 697, 716-17, 728, 734, 738, 742, 750, 754, 767, 774, 778, 792, 927). At most, Claimant expressed or displayed very minimal symptoms during the relevant period. (*Id.*). There are no significant subjective complaints, mental source statements, prior administrative findings, or any other critical conflicting evidence that the ALJ failed to consider. The ALJ evaluated the available evidence and determined that Claimant's mild functional limitations did not restrict her RFC.

This matter is distinguishable from recent cases in which this Court found that the ALJ's lack of explanation precluded meaningful review. The Court remanded several cases in which the ALJs did not discuss the claimants' mental impairments or mental functional limitations at all after step two of the sequential evaluation. *Dolly H. v. Kijakazi*, No. 2:22-CV-00573, 2023 WL 6566603, at *7 (S.D.W. Va. Aug. 31, 2023), *report and recommendation adopted,* No. 2:22-CV-00573, 2023 WL 6174413 (S.D.W. Va. Sept. 22, 2023); *Mary S. v. Kijakazi*, No. 2:23-CV-00302, 2023 WL 9007315, at *7 (S.D.W. Va. Aug. 24, 2023), *report and recommendation adopted,* No. 2:23-CV-00302, 2023 WL 9004929 (S.D.W. Va. Dec. 28, 2023); *Jones v. Kijakazi*, No. 5:21-cv-00634 (S.D.W. Va. Sept. 22, 2022), at ECF No. 18, *report and recommendation adopted*, *Jones v. Kijakazi*, No. 5:21-cv-00634 (S.D.W. Va. Nov. 28, 2022), at ECF No. 19; *Shank v. Saul*, No. 3:20-CV-00444, 2021 WL 2767063, at *8 (S.D.W. Va. June 11, 2021), *report and recommendation adopted,* No. CV 3:20-0444, 2021 WL 2744550 (S.D.W. Va. July 1, 2021).

Unlike this matter, the ALJs in the preceding cases did not express that medical

testimony informed the RFC analysis. (*Id.*). Reading the ALJ's RFC discussion as a whole, the ALJ sufficiently explained that he assessed that Claimant had mild limitations in the paragraph B criteria based on her periodic symptoms of depression and somatic disorder. (Tr. at 24). However, the ALJ did not assess RFC restrictions because Claimant's mental status examinations, including her unremarkable consultative examination, did not reflect any significant deficits. (*Id.*). The ALJ also previously cited in the decision Claimant's reported activities, which reflected on her functional abilities. (Tr. at 17-18). Although the ALJ could have more robustly articulated his mental RFC findings, the deficiency is harmless in this case because his reasoning is still quite apparent from the decision. For the above reasons, the undersigned **FINDS** that the ALJ's mental RFC analysis allows for meaningful review, and his findings are supported by substantial evidence.

## VIII.  Proposal and Recommendations

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 4); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 5); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date

of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  March 4, 2024

Cheryl A. Eifert
United States Magistrate Judge

23